## MANLEY *v.* THE STATE.

1. Section 28 of article 20 of the banking act of 1919 (Acts 1919, pp. 135, 219) does not violate the due-process clauses of the State and Federal constitutions for any of the reasons alleged in the demurrer to the indictment.

2. The indictment is not insufficient in law to charge the defendant with any crime, for the alleged reason that said section of said act, upon which it is based, is void for the reason that it is so vague and indefinite, and describes the act or acts designated as a crime in terms so general and indefinite, as to make the question of criminality depend upon the idiosyncracies of the court and jury, and in such terms that honest and intelligent men are unable to ascertain what particular act or acts it seeks to condemn.

3. Said section of said act is not violative of article 1, paragraph 5, of the constitution of this State, which provides that every person charged with an offense shall be furnished on demand with a copy of the accusation, in that an indictment under said section does not name the act or acts which are prohibited by law, and is inadequate to inform the person accused of crime of the nature of the accusation against him.

4. The certificate of a public officer of this State shall give sufficient validity or authenticity to any copy or transcript of any record, document, paper of file, or other matter or thing in their respective offices, or pertaining thereto, to admit the same in evidence in any court of this State.

(a) By the banking act of 1919 the superintendent of banks, upon taking over for liquidation an insolvent bank, is required to cause notice to be published in the newspaper in which the sheriff's advertisements of the county in which the bank is located are published, calling on all persons who have claims against the bank to present the same to him and make sworn proof thereof, filing the same with that officer at the office of the bank.

(b) Where in response to such notice certain Florida banks filed with the superintendent of banks verified claims against the bank in the hands of the superintendent for liquidation, certified copies of such claims are admissible in evidence in any court of this State, when relevant, and such certified copies are primary evidence.

(c) The original verified proofs of claims, so filed with the superintendent, without objection that certified copies thereof are the best evidence, are

admissible to establish the fact that the makers were asserting claims against the bank in liquidation; and the trial judge did not err in admitting them for this purpose, they being, when taken in connection with other evidence in the case, relevant upon the issue whether the defendant had fairly administered the affairs of the bank.

5. Courts will not admit in evidence, over objection, against the defendant in a criminal case, the unsworn statements of a person, though they purport to be based on his own knowledge, as evidence of the existence of the facts stated, for the reason that such unsworn statements of a person not called as a witness or subjected to the test of cross-examination are not recognized as having sufficient probative value to raise an inference that the facts are as stated.

(*a*) Letters written by bank examiners, deputy bank examiners, receivers, or auditors in charge, or cashiers, or other officers of various Florida banks, to the auditor in charge of the Farmers & Traders Bank, which was in possession of the superintendent for liquidation, in some of which the writers stated that they had letters of advice from the Bankers Trust Company that that company had deposited with the Farmers & Traders Bank various sums claimed by the Florida banks, and that these deposits were of the funds of the Florida banks, and in others of which the writers stated that the records of the Florida banks showed that the Georgia bank was indebted to the Florida banks in various sums for call money, were inadmissible when offered in evidence for the State against the defendant, over his objection that these letters contained unsworn and hearsay statements.

(*b*) But the illegal admission in evidence of these letters does not require the grant of a new trial, for the reasons: (1) that the trial judge distinctly instructed the jury that he admitted them simply as letters requesting the payment of demands, and not to establish the validity or legality of the demands or claims; (2) because the undisputed evidence shows that the claims of the Florida banks were not treated as liabilities of the Farmers & Traders Bank by the expert witnesses who alone testified to the insolvency of this bank; (3) because under the undisputed evidence, leaving out and wholly disregarding these letters and the evidence relating to these claims, and not treating these claims as liabilities of this bank, the bank was insolvent when taken over by the superintendent of banks for liquidation; and (4) because the verdict finding the defendant guilty of the fraudulent insolvency of this bank was required under the law and the evidence.

6. Wholly disregarding the claims of the Florida banks against this bank, the verdict finding the defendant guilty of the fraudulent insolvency of this bank was required by the evidence, and in such a case error in refusing to charge in reference to these claims will not necessitate a new trial. For this reason the refusal to give the requested instructions as set out in grounds 92 to 116, inclusive, of the motion for new trial, even if such requests were proper, will not require the grant of a new trial.

7. Where a witness knows a fact both from his personal knowledge and from hearsay, and the issue is one upon which the witness can express an opinion after giving the facts, it is competent for such witness to

testify that he knows the facts upon which he bases his opinion both from his personal knowledge and from hearsay.

(a) The insolvency of a bank can be established by the opinion of a witness, provided he gives the facts upon which his opinion is founded; and such testimony being competent, the jury must decide as to its weight and effect, and the credit they will give to it.

(b) Where a witness and others make an appraisal of the assets of an insolvent bank, such witness can testify as to the value put upon various bills receivable of the bank by such appraisers, as one of the facts upon which he bases his sworn opinion at the trial that the bank is insolvent; and such evidence is not hearsay.

8. Where documentary evidence consists of books of account or documents containing multifarious details, expert accountants may summarize their contents and testify to the result of the examination, provided the books and documents are made accessible to the court and parties. Where the purpose of such testimony is not to show the insolvency of the notes embraced in this appraisal, but to inform the jury what the books and records of the bank and this appraisal showed its financial condition to be, assuming such appraisal to be correct, it is not inadmissible upon the ground that it is hearsay.

9. Where the contents of a writing are not material to the inquiry, but the correctness of the classification embraced therein is relevant, it is permissible for the witness to refer to such document, and to describe it in a general way. The court did not err in admitting the evidence dealt with in the 9th division of the opinion. The purpose of this testimony was not to show that the appraisal had been made, but, assuming it to be made, the object was to show how much of the notes classified therein as good, as doubtful, and as worthless, had been collected; the ultimate object being to show whether the notes appraised as good were good, whether those appraised as doubtful were doubtful, and whether those appraised as worthless were worthless.

10. The court did not err in admitting the evidence dealt with in the 10th division of the opinion. An objection to evidence, not urged at the time it was admitted, and dealt with for the first time in the brief of counsel, will not be considered by this court.

11. The court did not err in refusing to permit a witness sworn for the State to answer the cross-question propounded to him, and dealt with in the 11th division of the opinion.

12. To make a custom or usage good, it must not be contrary to law. Custom can not change the positive law of the State. The defendant was not injured by the refusal of the court to permit the witness for the State to answer the question set out in the 12th division of the opinion. If the practice was legal, proof thereof was not required; and if the practice was illegal, such practice would not avail the defendant.

13. The instruction dealt with in the 13th division of the opinion was not error for the reason that the court thereby excluded from the jury, as a means of rebutting such presumption, any other facts or circumstances which might be sufficient to rebut the same; the court having expressly, in another part of his charge, instructed the jury otherwise.

14. The court did not err in giving to the jury the instruction dealt with in the 14th division of the opinion. This instruction was not erroneous, for the reason given in the preceding headnote.

15. The failure of the court to give to the jury the instruction set out in the 82d ground of the motion for new trial was not error, for the reason that the court did in effect give such instruction.

16. The capital stock of a bank is not a liability that should be taken into account in determining the question of solvency or insolvency of a bank, under section 28, article 20, of the banking act.

(*a*) The liability of a bank to its stockholders is not an asset that the jury should take into consideration in determining whether the bank is insolvent or not.

(*b*) Applying these principles, the charge of the court dealt with in the 16th division of the opinion, when fairly construed, is not erroneous.

17. The court did not err in refusing the requests to charge which are dealt with in the 17th division of the opinion, for the reason that these requests were fully and substantially covered by the general charge.

18. The refusal of a court to direct a verdict is never ground for reversal.

19. The opinion of an expert witness is not conclusive upon the jury. Such testimony is intended to aid them in coming to a correct conclusion upon the subject; but the jury is not bound by such opinion, and can disregard it. The jury may deal with such testimony as they see fit, giving credence to it or not. The verdict was not contrary to the evidence because an expert witness for the State testified that the bank had become insolvent and so remained for a period longer than four years before the return of the indictment. Such evidence would authorize such finding; but there was other evidence from which the deduction could be reasonably drawn that the insolvency of the bank took place within four years next preceding the return of the indictment.

20. The requests to charge, dealt with in the 20th division of the opinion, were covered by the charge as given, and their refusal does not require the grant of a new trial.

21. The court did not err in refusing the requests to charge dealt with in the 21st division of the opinion, for the reason that they were not warranted by the evidence.

22. The court did not err in admitting in evidence the documents or schedules referred to in the 22d division of the opinion, for the purpose of informing the jury what notes the State claimed to be good, what notes doubtful, and what notes worthless.

23. The verdict is supported by the evidence.

No. 6160.    JULY 11, 1928.

Fraudulent bank insolvency. Before Judge Howard. Fulton superior court. June 25, 1927.

W. D. Manley and others were jointly indicted. The indictment charges them with the offense of felony, for that in the County of Fulton, this State, on July 12, 1926, Manley being president of the Farmers & Traders Bank, a chartered bank incorporated under the laws of this State, and he and the other defendants being directors of said bank, and being charged with the fair and legal administration of its business and affairs, and dur-

ing their said official charge and responsibility, "said Farmers & Traders Bank did become fraudulently insolvent, contrary to the laws of said State, the good order, peace, and dignity thereof." Manley demurred to the indictment, upon grounds which appear in the opinion. The demurrer was overruled, and he assigns error on that ruling. The jury returned a verdict finding the defendant guilty. He moved for a new trial upon the general grounds, and upon many special grounds which appear from the opinion.

According to the evidence, the Farmers & Traders Bank had a capital of $25,000. The defendant was one of its directors from its organization in 1900, and was its president from 1914 to July 12, 1926, when it was placed in the hands of the superintendent of banks. The defendant was president of the Bankers Trust Company. When the Farmers & Traders Bank closed, its books showed that it was solvent, treating its bills receivable and assets as of their face value.

E. B. Lewis was cashier of this bank from June 5, 1925, until it closed. He had twelve years experience in banking. A run on the bank began on Saturday before it closed on Monday. When it opened on Monday it had only $7000 in cash. Before opening on that day the cashier told the defendant that this sum was not sufficient in case there was a run on the bank. The defendant told him to open the bank, that there was nothing wrong, and he would take care of it. The defendant did not make any arrangements to supply the necessary money. Later on Monday he sent a written notice signed by him and the other directors of the bank, placing the bank in the hands and control of the superintendent of banks, which notice was posted on the door of the bank; and the superintendent of banks took possession. The banks composing the Atlanta Clearing House refused to handle the clearing account of this bank. Its balance was insufficient. The cashier informed the defendant that the bank was insolvent. During a period of about 30 days preceding the closing of the bank, the defendant drew out various amounts approximating $90,000, and placed them with various banks composing the chain of banks of which this bank was one. As these amounts were drawn out he would instruct the cashier to make an entry on the books of this bank, charging each bank with the amount it got. That memorandum or instruction came from the Bankers Trust Company. The defendant drew the

checks for these amounts at the Bankers Trust Company, and not at this bank. The bank did not get any security in any shape or form for this withdrawal of $90,000. It did not get notes therefor. The money was from the deposits in the bank. The books of the bank showed $17,000 profit and loss, treating its assets and bills receivable at their face or book value. This wiped out the surplus and impaired the capital of the bank approximately $2000. There were $103,000 withdrawn and paid on notes negotiated by the Bankers Trust Company with this bank. Most of those notes were renewals. After the bank closed, a committee composed of the cashier and assistant cashier of the bank and three depositors appraised the value of the bills receivable held by this bank. Of the notes representing the $103,000 the committee appraised as good $28,000, as doubtful $19,000, and as worthless $55,500. This appraisal was unanimous. Lewis, the cashier, testified: "I think I have personal knowledge of the assets and liabilities of this bank as a whole when it closed. Judging from the assets and liabilities, I would say that it was certainly insolvent within 30 days from the time we had the withdrawal of $90,000, and that it was certainly insolvent when they withdrew that $90,000. My opinion is that it was insolvent the day I took it over the year before." The Bankers Trust Company borrowed from the National Park Bank $20,000, and the Farmers & Traders Bank furnished about $40,000 of its collateral to secure this loan. This paper matured in 90 days. The cashier of this bank was instructed by the treasurer of the Bankers Trust Company to reshape the collateral and return it to the New York bank with a renewal note, which he did. The collateral securing this note amounted to over $39,000. The cashier then thought the paper was renewed in New York, and made entries on the bank books charging the New York bank with the $20,000. In a few days the cashier was advised that the note was refused renewal in New York, and that the defendant took the collateral over as a personal matter. The cashier then made the proper entries on the bank books, crediting bills receivable with the $20,000, and charging the defendant. In a day or two the defendant instructed the cashier to credit his checking account with $5000 of that $20,000, for which he held collaterals amounting to $39,000. This bank had a time certificate outstanding in favor of Lodi Trust Company for $9500. About the time this crash came the defendant instructed

the cashier to send him immediately $20,000 of the best collateral the bank had, not to include anything from the Bankers Trust Company. This the cashier did. After deducting $55,500 out of the above notes amounting to $103,000, $39,000 of notes to secure the transaction with the defendant, $20,000 in notes to secure the Lodi Trust Company, and the $90,000 cash withdrawn and placed with the various chain-member banks, the notes of the bank amounted to $386,000. The committee appraised 52 per cent. of these notes as good, $114,000 of the bills receivable of the bank as worthless (this including $55,000 of the above $103,000 in notes appraised as worthless), and $168,000 of the bills receivable of the bank as doubtful.

R. E. Bentley, an auditor of 21 years practical experience in banking, as an officer of both small and large banks, testified as follows: "Have made quite an extensive examination along certain lines of the Farmers & Traders Bank. Have examined the books of the bank and others in connection with this investigation. Have read the minutes of the bank in arriving at my conclusion. From the information in the record it is very clear to me as a banker that the bank had been insolvent since the first of 1915. . . When I stated that in my opinion this bank was insolvent and that the insolvency dated back as far· as 1915, I eliminated from consideration the capital stock or capital and .surplus, and considered a reasonable time within which to liquidate the assets of the bank. I excluded undivided profits. In offsetting the liabilities against the assets in the manner in which I said I did it, it is now my opinion, after considering all of those things I have been asked about, that the bank was insolvent as far back as 1915."

Clifford Cagle, an accountant and auditor, was employed to examine the affairs of this bank after it went into the hands of the State bank examiner. He was assisted by J. E. Perry, an accountant. They examined the books of the bank. He testified that according to the trial balance on the books the assets were $575,016.49, and the liabilities, exclusive of capital and surplus, amounted to $531,000. He took down the assets as they were appraised by the committee above referred to. According to this appraisal $114,-420.48 of the notes of the bank were worthless, and $168,159.04 were doubtful. "After taking the worthless assets alone, after deducting the assets appraised as worthless by the appraisal com-

mittee, . . it would reduce the assets to such an extent that the capital and surplus would be wiped out, and there would be a deficit of $76,495. . . After you deduct the assets appraised as doubtful by the committee, of $168,159, that would leave the deficit over and above all the assets and the capital stock of $244,654.59. . . After that is done, that leaves the liabilities, deducting the capital stock and surplus as shown by the books, the liabilities would be $537,000, and your assets $292,000 and some dollars. That would leave, then, an insolvency of the difference between $292,000 and $513,000." The bank had deposits subject to check of $211,-343.67, deposits in the savings department of $127,714.02, and certificates of deposit amounting to $51,519.69; total $390,577.38. The bank owed other banks $32,010.55. The bank owed the Bankers Trust Company on open account $1124.42, and accounts payable $206.43, making a total of $464,918.78. The real estate of the bank consisted of the banking house on Peters street, some property in Florida, a lot on East Fair street, and some property in Crystal City, Texas. They carried this property on the books as of the value of $29,675.62. It was appraised at $20,600. "According to the books, and defining solvency as meaning excess of assets over liabilities other than capital stock and surplus, the books would show that the bank was solvent. . . Whether that was true would depend upon what the assets were worth that they carried."

Z. G. McGee was the assistant liquidating agent in charge of this bank under the State banking department. He had had the report of Mr. Cagle and Mr. Perry in his office. According to this report $114,420.48 of the notes of the bank appeared as worthless. He had been trying to collect something out of those notes for about three months; had sent the makers notices; had called on all of those with whom he could get in touch personally; had secured all the information on the makers that he could, relative to what they were worth, and their ability to pay. "Do not think offhand I have collected any cash out of those worthless notes in the three months I have had charge. I have set off some, and charged off some. I don't recall any note that I have collected in cash. Those notes that I have gone into, I would consider them just as worthless as they appear there. They are worth nothing, those that I have investigated. I have not collected anything out of any of them except by these offsets. There is a column marked 'Doubt-

ful,' which the records show amounts to $168,159.04. I have collected out of those people, . . in the three months I have been working and in charge of it, $500, a note. The total collections, counting offsets and cash, would amount to approximately $85,-000 out of the good assets of $292,436. I have got $58,000 out of the $292,000 that appears to be good. Out of the $168,000 that appears to be doubtful I have collected $500, and out of the $114,000 that appears to be worthless I have not collected anything. I remember that particular schedule marked 'Notes Receivable in Bank, Negotiated by the Bankers Trust Company, According to R. E. Lewis.' It seems to be $103,000; good $28,025, doubtful $19,477, and worthless $55,500. I have collected this item of $150 that appears as doubtful. Out of the worthless column I got nothing, except that Traders Trust Company. I can explain that. There was a $3000 note. Working with the receiver of that company we sold the collateral that was attached to the trust company's note for $3000, for about $900. The balance of the note was paid by an offset. We got in cash out of the $103,000 ' . . approximately $4,000. That is a part of the $58,000 that I got out of all of it."

The Farmers & Traders Bank did not pay any dividend on its stock for a period of about 10 years before it suspended. The defendant applied to the member banks of the Atlanta Clearing House Association for a loan of $3,000,000, which he stated would be necessary to save his chain of banks. This loan was declined. He then applied to these members for a loan of $100,000, which he said would tide over the affairs of this bank. He submitted to a committee of these banks all of the papers of this bank, amounting to between $320,000 and $325,000. This committee declined to examine any paper under $500, or any automobile paper. After an examination of the collateral offered, the committee declined to recommend to member banks the loan of $100,000.

The cashier of this bank, who was a member of the committee who appraised its assets after it went into the hands of the State banking department, testified that he did not know a number of the makers of the notes appraised, what property they owned, or what tax returns they made; that when a note was called out, if a member of the committee knew the standing and credit of the maker thereof it was accepted. Inquiry was made about the standing of the makers of these notes. This was the method used by

the committee in reaching the unanimous appraisal of the assets of this bank.

The defendant was connected with and interested in the following corporations: Phœnix Building Co., Traders Trust Co., Georgia Farm Loan Co., United Realty Co., Harper & Weathers Co., The Avalon Co., Bankers Security Co., The Atlanta Builders Inc., Bankers Financing Co., Bankers Guaranty Corporation, Georgia Realty Co., Morningside Park Co., The Amortization Co., W. D. Manley & Co. Inc., and Empire Sales Corporation. The books and papers of all these corporations were kept in the place where the Bankers Trust Company did business. About $300,000 of the notes of these companies were held by this bank. The defendant was president of the Georgia State Bank. In June and July, 1926, between $40,000 and $50,000 of the money of the Farmers & Traders Bank was placed with that bank, for which no security was taken, not even an evidence of debt. This sum was charged on the books of this bank as call money placed with the Georgia State Bank. This sum was a part of the $90,000 call money drawn from this bank and placed with other banks in the Manley chain during the above period. These banks and the amounts placed with them were as follows: Bank of Abbeville, $6000; Alma State Bank, $5000; Barney Banking Company, $5000; Farmers & Merchants Bank, Chipley, $5000; Madison County Bank, $1500; Bartow County Bank, $2000; Bank of Lyerly, $1000; Bank of Molena, $1000; Bank of Parrott, $500; Bank of Pineview, $1000; Plains Bank, $5000; Bank of Powder Springs, $3500; Farmers & Merchants Bank of Rebecca, $1000; Bank of Smithville, $5000; Bank of Smyrna, $1000; Farmers & Merchants Bank, Sylvester, $2067.50; Temple Banking Company, $2000; Peoples Exchange Bank, Tennille, $500; Georgia State Bank, Bowdon, $21,000; Georgia State Bank, Bronwood, $1000; Georgia State Bank, Cumming, $2500; Georgia State Bank, Hogansville, $500; Georgia State Bank, Maysville, $2000; Georgia State Bank, Ocilla, $6500; Georgia State Bank of Vidalia, $11,500; Bank of Weston, $2000. Most of these banks failed. The Bank of Parrott is still running. The Farmers & Merchants Bank of Chipley, the Farmers & Merchants Bank of Rebecca, and the Bank of Weston reopened. No security was taken for these advances to these banks. This bank did not even take notes for them.

In the years 1922, 1923, 1924, 1925, and 1926 the Bankers Trust

Company received considerable call money from Florida banks, to be put out on call. This money was handled on the defendant's order. All of this money was deposited with the Farmers & Traders Bank, to the checking account of the Bankers Trust Company, and was drawn out on its checks. The defendant caused the treasurer of the Bankers Trust Company to write each of the Florida banks that the call money sent to the Bankers Trust Company by that bank had been deposited with the Farmers & Traders Bank. The Bankers Trust Company paid the interest on this call money to the Florida banks. The Farmers & Traders Bank had on call $160,-000 of money of the Manley chain of banks, and paid on this sum six per cent. interest, when the bank could have procured this money at three and one half or four per cent. From February 11, 1919, to June 11, 1926, the defendant's account in this bank was overdrawn 1132 times, ranging in sums from $36 to $7500. The Avalon Company, from July 26, 1923, to May 18, 1925, was overdrawn 33 times, in amounts ranging from $39 to $2000. From April 6, 1923, to June 29, 1926, the Bankers Security Company was overdrawn 390 times, ranging in amounts from $49 to $1600. The Bankers Financing Company, from August 31, 1922, to July 12, 1926, was overdrawn 678 times, in amounts ranging from $50 to $2700. The last entry on the ledger sheet of the bank showed a credit balance to this company of $14,457.05, when the account was closed. The Traders Trust Company from August 16, 1923, to June 21, 1926, was overdrawn 110 times, in amounts ranging from $41 to $550. This account was closed on June 21, 1926, when this company had a credit balance of $4299.10. From May 4, 1922, to March 3, 1926, J. R. Smith & Company, a firm composed of J. R. Smith and the defendant, overdrew 360 times, in amounts ranging from $75 to $7000. The overdraft on March 3, 1926, was $132.50. There were about $1,500,000 of the papers of the Manley corporations in the Manley chain banks. The defendant was the guarantor of between $500,000 and $1,000,000 of this paper.

The defendant obtained loans from this bank as follows: January, 1920, $16,205; February, $16,776; March, $16,970; April, $16,458; May, $13,278; June, $13,130; July, $13,247; August, $5479; September, $10,035; October, $12,457; November, $10,-643; December, $11,522; January, 1921, $14,071; February, $12,-

675; March, $13,185; April, $11,013; May, $9701; June, $9848; July, $10,832; August, $13,695; September, $16,493; October, $16,-302; November, $17,281; December, $12,364. He had similar loans during each month of 1922, 1923, 1924, and 1925. In the latter year these loans ranged from $2003 in November, to $14,152 in January. In 1926 the defendant was overdrawn—January, $762; February, $708; March, $2765; April, $1629; May, $6240; June, $3119. These loans were paid up. The books of the bank showed that the wife of the defendant obtained from it various loans during the period from January, 1920, to March, 1924, ranging in amounts from $5000 to $7785. Bankers Trust Company obtained loans during the period from January, 1920, to December, 1925, ranging in amounts from $481 to $20,000. These loans were paid. J. R. Smith, vice-president of this bank, and J. R. Smith & Company, during the period from January, 1920, to December, 1923, obtained from this bank various loans ranging in amounts from $174 to $12,770. Georgia Realty Company, during the period from January, 1920, to December, 1925, obtained from this bank various loans ranging in amounts from $1130 to $45,675. The Avalon Company, during the period from September, 1920, to December, 1925, obtained from this bank various loans ranging in amount from $3125 to $12,517. The Bankers Investment Company, during the period from January, 1921, to April, 1922, obtained loans ranging from $3562 to $17,866. L. R. Adams, an officer and director of the Bankers Trust Company, obtained from this bank, during the period from August, 1922, to December, 1925, loans ranging in amount from $2560 to $6781. After an overdraft of Harper & Weathers Realty Company was charged to profit and loss from time to time, this bank discounted a paper for $1000 on which it was an indorser. This bank bought the entire capital stock of Traders Trust Company, amounting to $30,000. It kept this stock from April 14, 1915, to July 10, 1925, and no dividends were paid thereon.

The individual ledger sheets of the defendant in this bank from January 7, 1924, to December 17, 1924, were missing. Excessive and unsecured loans were made to the president and directors of this bank. Harper-Weathers Realty Company, Georgia Realty Company Inc., the Avalon Company Inc., Consolidated Realty Company Inc., Atlanta Builders Inc., Bankers Financing Company, Traders

Trust Company, Georgia Farm Loan Company Inc., and Bankers Security Company were all adjudicated bankrupts in August, 1926.

When this bank suspended, the Traders Trust Company owed it $3000, the Avalon Company $2330.20, the Bankers Guarantee Corporation $1432, the Georgia State Bank $4000 for money borrowed the day this bank suspended, Phœnix Building Company $3000. These amounts do not include overdrafts. The record discloses that the Farmers & Traders Bank and the Bankers Trust Company were engaged in kiting. This bank was not a member of the Atlanta Clearing House Association, but for years had had its paper cleared through the Atlanta & Lowry National Bank, and its predecessor. The Atlanta & Lowry National Bank notified this bank that it would no longer clear its paper through the Atlanta Clearing House.

*Little, Powell, Smith & Goldstein, Paul S. Etheridge,* and *Colquitt & Conyers,* for plaintiff in error.

*John A. Boykin, solicitor-general, Reuben R. Arnold,* and *Hugh Howell,* contra.

HINES, J. (After stating the foregoing facts.)

1. The defendant was indicted under section 28 of article 20 of the banking act, which declares that "Every insolvency of a bank shall be deemed fraudulent, and the president and directors shall be severally punished by imprisonment and labor in the penitentiary for not less than one (1) year nor longer than ten (10) years: Provided, that the defendant in a case arising under this section may repel the presumption of fraud by showing that the affairs of the bank have been fairly and legally administered, and generally with the same care and diligence that agents receiving a commission for their services are required and bound by law to observe; and upon such showing the jury shall acquit the prisoner." Acts 1919, pp. 135, 219; 8 Park's Code Supp. 1922, § 2281(bb). The defendant demurred to the indictment, upon the ground, among others, that it violates the due-process clauses of the State and Federal constitutions, in that its terms are so vague and indefinite, and describe the acts made criminal in language so general and indefinite, as to make the question of criminality depend upon the idiosyncrasies of the men who may happen to constitute the court and jury; and sets up no ascertainable and fixed standard of guilt. This contention has been decided by this court adversely to the de-

fendant. The above section of the banking act is a substantial re-
enactment of section 204 of our Penal Code of 1910, which first
appeared in our Penal Code of 1833, and which has reappeared in
every Code since that date. In *Griffin* v. *State,* 142 *Ga.* 636 (83
S. E. 540, L. R. A. 1915C, 716, Ann. Cas. 1916C, 80), this court
held that this section of the Penal Code did not violate the due-
process clause of the Federal constitution, in that: (a) it abridged
the privileges and immunities of citizens of the United States;
(b) it deprived the president and directors of a bank of equal
protection of the laws with like officers of other corporations, as
to which there is no law providing that insolvency of the corpora-
tion shall be deemed fraudulent, and that the president and direct-
ors, or other officers, shall be punished; (c) it destroys or abridges
the presumption of innocence which the law raises as evidence in
behalf of every one charged with crime; (d) it deprives the presi-
dent and directors of an insolvent chartered bank of the right of
presenting their defense to the charge of fraudulent intent; (e) it
declares the insolvency of a chartered bank to be fraudulent, and
provides that its president and directors shall be punished, even
though they had nothing to do with the management of the bank,
and though the insolvency was not brought about by their conduct
or with their knowledge; or (f) for any other reasons suggested
by the defendant's demurrer. It may be said that this court in
that case did not deal with the ground that this section of our Penal
Code violates the fourteenth amendment to the constitution of the
United States, upon the ground that its terms are so general and
indefinite as to fix no certain standard of guilt; and that the de-
cision in the *Griffin* case is not authority for sustaining the consti-
tutionality of section 28, article 20 of the banking act of 1919. In
the *Griffin* case this court distinctly held that this section does not
violate the due-process clause of our State constitution. As the
due-process clauses of both the State and Federal constitutions are
practically identical, the ruling in the *Griffin* case is in effect a
holding that the section cited does not violate the due-process clause
of the Federal constitution. In *Fordham* v. *State,* 148 *Ga.* 758
(98 S. E. 267), this court followed the ruling in the *Griffin* case,
and held that the section in question "is not violative of the 14th
amendment to the constitution of the United States on the ground
that it denies to persons indicted thereunder due process of law or

equal protection of the law." In *Snead* v. *State,* 165 *Ga.* 44 (139 S. E. 812), this court was called on to pass upon the constitutionality of the above section of the banking act of 1919, and held that "There is no merit in the ground of demurrer asserting that the provisions of section 28 of article 20 of the banking act of 1919 (Acts 1919, pp. 135, 219) is violative of the fourteenth amendment to the Constitution of the United States." In view of the rulings in the cases just cited, said section of the banking act of 1919 does not violate the due-process clauses of the State and Federal constitutions. If this question were now an open one in this court, we would follow the ruling made in the cases above dealt with. Those decisions ruled that the presumption created by section 204 of the Penal Code, and section 28, article 20, of the banking act of 1919, does not violate due process. Within proper limits the legislature may make proof of specified acts prima facie evidence of guilt of the accused. Such presumption must not be final. It must not be arbitrary or wholly unreasonable, unnatural, or extraordinary. It must bear some reasonable relation to the facts proved. The accused must be allowed an opportunity to make his defense, show all the facts bearing on the issue, and to have the whole case submitted to the jury for decision, after considering all the evidence as well as such presumption. *Griffin* v. *State,* supra; *Fordham* v. *State,* supra; *Kunsberg* v. *State,* 147 *Ga.* 591 (95 S. E. 12); *Hawes* v. *State,* 150 *Ga.* 101 (103 S. E. 413). A statute which makes an act penal in terms so vague that men of common intelligence must guess at its meaning, and differ as to its application, violates the first essential of due process of law. The terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it of what acts or conduct on their part will render them liable to its penalty. This is a well-recognized requirement under ordinary notions of fair play and the settled rules of law. Waters-Pierce Oil Co. *v.* Texas, 212 U. S. 86 (29 Sup. Ct. 220, 53 L. ed. 417); International Harvester Co. *v.* Kentucky, 234 U. S. 216, 221 (34 Sup. Ct. 853, 58 L. ed. 1284); Collins *v.* Kentucky, 234 U. S. 634, 638 (34 Sup. Ct. 924, 58 L. ed. 1510); Fox *v.* Washington, 236 U. S. 273 (35 Sup. Ct. 383, 59 L. ed. 573); American Seeding Machine Co. *v.* Kentucky, 236 U. S. 660 (35 Sup. Ct. 456, 59 L. ed. 773); Miller *v.* Strahl, 239 U. S. 426 (36 Sup. Ct. 147, 60 L. ed. 364); Tedrow *v.* Lewis,

255 U. S. 98 (41 Sup. Ct. 303) ; Kinnane *v.* Detroit Creamery Co., 255 U. S. 102 (41 Sup. Ct. 304) ; Weeds Inc. *v.* United States, 255 U. S. 109 (41 Sup. Ct. 306) ; Connally *v.* General Construction Co., 269 U. S. 385 (46 Sup. Ct. 126). When a criminal statute employs language having a technical or other special meaning well-enough known to enable those within its reach to correctly apply it, it does not fall within the condemnation of the above principle. Hygrade Provision Co. *v.* Sherman, 266 U. S. 497, 502 (45 Sup. Ct. 141) ; Omaechevarria *v.* Idaho, 246 U. S. 343, 348 (38 Sup. Ct. 323, 62 L. ed.     ). So when a statute employs words with a well-settled common-law meaning, although it may contain an element of degree in the definition as to which estimates may differ, it is not void for uncertainty. Nash *v.* United States, 229 U. S. 373, 376 (33 Sup. Ct. 780, 57 L. ed. 1232). Are the terms of the above section of article 20 of the banking act of 1919, sufficiently plain and explicit to inform persons of ordinary intelligence of what conduct on their part will render them liable to its penalty? Under this statute proof of the insolvency of a bank raises the presumption that such insolvency is fraudulent. This is perfectly plain. It then provides that the defendant in a case arising under this section may repel the presumption of fraud by showing that the affairs of the bank have been fairly and legally administered, and generally with the same care and diligence that agents receiving a commission for their services are required and bound by law to observe; and upon such showing the jury shall acquit him. These terms are not uncertain and indefinite. The affairs of a bank are fairly administered when honestly administered. A person of ordinary intelligence, entrusted with the management of the affairs of a bank, knows when he is fairly and honestly administering these affairs. The affairs of a bank are legally administered when administered in accordance with law. Our statutes make certain acts in the administration of the affairs of banks unlawful. Presidents and directors of banks are chargeable with knowledge of these statutes, and they should acquaint themselves with their terms and requirements. The statute under consideration requires these officers to administer the affairs of the bank in their charge in accordance with these laws. This is perfectly plain. This presumption places upon these officers the burden of showing that they administered the affairs of the bank with the same care

and diligence that agents receiving a commission for their services are required and bound by law to observe. This care and diligence is defined by law. It is "that ordinary care, skill, and diligence required of a bailee for hire." Civil Code, § 3581. All these terms and requirements of the statute are plain and definite; and when a defendant who is charged with a violation of this statute shows that he complied with these requirements, the jury is required to acquit him. In addition, this statute, as construed by this court, permits the accused to rebut the presumption against him, arising from proof of the insolvency of the bank, by showing other facts, such as that the insolvency was caused by an unexpected panic in the country, or by the speculation of some officer or agent for which the accused was in no way responsible, or by any other facts rebutting the presumption of fraudulent conduct on his part. *Griffin* v. *State,* supra. The statute by clear and explicit terms fixes standards by which both the guilt and innocence of a defendant can be determined. It follows that this statute does not violate the due-process clauses of the State and Federal constitutions for the reason that its terms are so indefinite and uncertain as not to inform one accused of its infraction with what he has to meet on his trial.

2. It follows necessarily from what has been said that the indictment is not subject to demurrer upon the ground that said section of said act is void for the reason that its terms are so general and indefinite as to make the question of criminality depend upon the idiosyncracies of the men who happen to constitute the court and jury, and do not enable honest and intelligent men to ascertain what particular act or acts it seeks to condemn.

3. Said section of the banking act of 1919 is not violative of article 1, paragraph 5, of the constitution of this State, which provides that every person charged with an offense shall be furnished on demand with a copy of the accusation, in that the indictment does not name the act or acts which are prohibited by law, and is inadequate to inform the defendant of the nature of the accusation against him. The indictment need not allege the acts which caused the insolvency of the bank; and it need not specify the illegal acts upon which the State relies to show that the defendant did not administer the affairs of the bank in a legal manner. *Snead* v. *State,* supra.

4. In various grounds of his motion for new trial the defendant

asserts that the court erred in admitting in evidence, over his objections, proofs of claims of various Florida banks against the Farmers & Traders Bank, filed with the State superintendent of banks after the latter bank was taken in charge by him on July 12, 1926, for liquidation, each of these claims being verified by an affidavit by some officer of the bank making the claim. Each of these proofs set out that the Farmers & Traders Bank owed the claimant bank a given amount of- call money, subject to withdrawal on demand, prior to July 12, 1926. By the banking act the superintendent, upon taking over for liquidation an insolvent bank, is required to cause notice to be given by advertisement in the newspaper in which are published the sheriff's advertisements of the county in which the bank is located, and in any other newspaper when he may deem it necessary or advisable, once a week for four weeks, calling on all persons who have claims against the bank to present them to him and make sworn proof thereof, filing them with him at the office of the bank, and within a time to be specified in the notice, not less than ninety days from the date of the first publication of the notice. A copy of this notice is required to be mailed to all persons whose names appear as creditors upon the books of the bank. Acts 1919, pp. 135, 158; 8 Park's Code Supp. 1922, § 2268(m). These proofs of claims objected to were papers of file in the office of the department of banking. The certificate of any public officer of this State shall give sufficient validity or authenticity to any copy or transcript of any record, document, paper of file, or other matter or thing in their respective offices, or pertaining thereto, to admit the same in evidence in any court of this State. Civil Code, § 5798. There was no objection upon the ground that certified copies of the proofs of claims were the best evidence. The State was not undertaking to introduce the testimony of the persons who verified these proofs of claims, or what appeared upon the books of these banks. It was offering the records appearing in the office of the banking department. The mistake of the plaintiff in error consists in the assumption that these proofs of claims are the personal testimony of the bank officers who verified them. As such records certified copies thereof were admissible. Such records are not hearsay. They are not the testimony of witnesses with whom the defendant has to be confronted. They do not purport to set forth the contents of the books of the Florida banks. If there had

been objection upon the ground that certified copies of these records thereof were primary evidence, another question would have been made. These documents were admissible to establish the fact that these banks were asserting claims against the Farmers & Traders Bank, although they may have been insufficient to establish the validity of such claims; and this evidence, when taken in connection with other evidence showing the history and origin of these claims, was relevant in throwing some light on the issue whether the defendant had fairly administered the affairs of this bank. For this reason the court did not err in admitting these records over the objections urged. *Shivers* v. *State,* 53 *Ga.* 149.

5. In forty-seven grounds of his motion for new trial the defendant assigns error upon the admission, over his objections, of various letters written, after the Farmers & Traders Bank had been taken over by the superintendent of banks for liquidation, by bank examiners, deputy bank examiners, receivers, or auditors in charge, or by cashiers or other officers of various Florida banks, to J. T. Perry, auditor in charge of the Farmers & Traders Bank under the superintendent of banks; and of the replies by Perry. Some of these letters stated that the writers had letters of advice from P. J. Baker, treasurer of the Bankers Trust Company, stating that the Bankers Trust Company had deposited with the Farmers & Traders Bank various sums claimed by the Florida banks, and that these deposits were the funds of the Florida banks. Others stated that records of the Florida banks showed that the Georgia bank was indebted to the Florida banks in various amounts. The reply letters by Perry stated that the records of the Farmers & Traders Bank showed no indebtedness to the Florida banks. To the admission of these letters the defendant objected upon the grounds that he urged to the admission of the proofs of claims of the Florida banks dealt with in the foregoing division, and he moved to rule out each of these letters upon the same grounds. Courts will not admit against a defendant in a criminal case the unsworn statements of a person, though they purport to be based on his own knowledge, as evidence of the existence of the facts stated. The reason on which this rule is based is that the unsworn statement of a person not called as a witness or subjected to the test of cross-examination is not recognized as having sufficient probative value to raise an inference that the facts are as stated. Statements otherwise ob-

jectionable as hearsay do not become competent because they are made in a judicial proceeding, or because they are contained in records or in letters on file in some department of government, in the absence of some statute making them admissible.    22 C. J. 207; *Hickson* v. *Bryan,* 75 *Ga.* 392; *Aripeka Saw Mills* v. *Georgia Supply Co.,* 143 *Ga.* 210 (84 S. E. 455); *Owen* v. *Groves,* 145 *Ga.* 287 (6) (88 S. E. 964).    These letters contained statements that the books of the Florida banks showed that the Farmers & Traders Bank owed these banks certain sums of call money, or that funds of these banks had been deposited by the Bankers Trust Company in the Farmers & Traders Bank.    These statements were not sworn to, and for this reason were hearsay as to the defendant in this case.    The production of the books of these banks, with identification, would not have been sufficient to entitle them to admission to establish the indebtedness of the Georgia bank to the Florida banks.    These books would have had to be accompanied by the oath of the persons who made the entries, or the oath of some person who knew the entries to be correct.    *Southern Home &c. Asso.* v. *Butler,* 111 *Ga.* 826 (35 S. E. 679); *Dougan* v. *Dunham,* 115 *Ga.* 1012 (42 S. E. 390).

But we do not think that the erroneous admission in evidence of these letters requires the grant of a new trial.    We can not agree with the contention of able counsel for the defendant that this evidence was prejudicial to him.    In our opinion their admission was harmless, for several reasons.    In the first place the trial judge distinctly instructed the jury that he admitted them simply as letters requesting payment of demands, and not to establish the validity or legality of the demand or claim.    With this instruction jurors of average intelligence could not treat these letters as establishing liabilities against this bank, and as tending to establish its insolvency.    In the second place, the undisputed evidence shows that these claims of the Florida banks were not treated as liabilities of the Farmers & Traders Bank by the expert witnesses who testified to the insolvency of this bank; and that, leaving out and wholly disregarding the evidence relating to these claims, and not treating them as liabilities, this bank was insolvent when taken over by the superintendent of banks for liquidation.    In the third place, in view of all the evidence, the finding that this bank was insolvent is required.    This being so, and the evidence further showing that the

defendant was the president and a director of this bank and the dominating and controlling manager of its affairs, the law cast upon him the burden of showing that the affairs of the bank were fairly and legally administered, and generally with the same care and diligence that agents receiving a commission for their services are bound by law to observe. The evidence introduced by the State does not show such administration of the affairs of this bank by the defendant. On the contrary, this evidence tends to affirmatively show that he did not so administer its affairs. For instance, his checking account was often overdrawn during each of the six months preceding the closing of the doors of this bank. In May of that year his overdraft amounted to $6240. During June of that year his overdraft amounted to $3119. During the period from February 11, 1919, to June 9, 1926, the defendant's account was overdrawn 1132 times. It does not appear that these overdrafts were authorized by the board of directors of this bank. Without such authority the defendant committed a misdemeanor in making these overdrafts. 8 Park's Code Supp. 1922, § 2281(s) ; Michie's Penal Code, § 211(19). This bank during the years 1920 to 1925, inclusive, made loans to the defendant in excess of 20 per cent. of its capital and unimpaired surplus. In January, 1925, it loaned to the defendant $14,152. During the period of thirty days prior to its suspension of business, the defendant procured this bank to make loans of call money to various other banks, members of a chain of banks of which this bank was one, some of which were in excess of 20 per cent. of its capital and unimpaired surplus. Such excessive loans are expressly prohibited by statute. Acts 1919, p. 196; Acts 1922, pp. 63, 68; 14 Park's Code Supp. 1926, § 2280(m) ; Michie's Code, § 2366(159). The making of such loans was not a fair and legal administration of the affairs of the bank. Some of these loans exceeded ten per cent. of the capital of the bank, and were not secured by good collateral or other ample security. Acts 1919, pp. 135, 196; 8 Park's Code Supp. 1922, § 2280(m).

The defendant procured this bank to purchase $103,000 of the notes of the Bankers Trust Company; and that company received that sum from this bank for that paper. Some of these notes were renewals. Some of them were the paper of corporations in which the defendant was interested. He knew that some of this paper was insolvent. $55,500 of these papers were found to be insolvent. On

the day this bank closed its doors and went into the hands of the superintendent of banks, the defendant procured this bank to make to another bank of which he was president a loan of $4000, when this bank was in distress for funds to meet its obligations. There are many other facts in the record which show mismanagement of this bank. The defendant introduced no evidence, and made no statement. In these circumstances, and taking into consideration the presumption arising from proof of its insolvency, a finding that the insolvency of this bank was fraudulent was required. For these reasons, the illegal admission of these letters does not require the grant of a new trial.

6. Separately, and as to each of the Florida banks, the defendant in writing requested the court to instruct the jury that the evidence was not sufficient to show a legal indebtedness to the Florida banks, and that the claimed indebtedness to such banks, as to which evidence had been offered, should not be considered by the jury in passing on the solvency or insolvency of the Farmers & Traders Bank. The court refused these requests. Nowhere in the general charge did the court give to the jury any instruction whatever on this subject. In grounds 92 to 116 inclusive of his motion for new trial the defendant assigns error on the refusal of the requested instructions. The liability of the Farmers & Traders Bank on these claims of the Florida banks is not free from doubt; but conceding that this bank is not liable on these claims, and that the court should have instructed the jury as a matter of law that it was not so liable, we do not think that the refusal to give to the jury the instructions embodied in these requests requires the grant of a new trial, for the reasons given in the foregoing division. If the treatment of these claims as liabilities of this bank were necessary to establish its insolvency, and if the court as a matter of law was authorized to instruct the jury that they were not liabilities of this bank, then these instructions should have been given; but as the evidence establishes the insolvency of the bank without considering these claims as liabilities against it, and as the guilt of the accused is clearly proved, the failure of the court to give these instructions does not require the grant of a new trial. In *Stephens* v. *Crawford,* 1 *Ga.* 574 (44 Am. D. 680), it was ruled: "This court will not send a cause back for a rehearing because of the admission of illegal testimony, if, wholly irrespective of that testimony, there was plainly and ob-

viously testimony sufficient to justify the finding." In *Arrington* v. *Cherry,* 10 *Ga.* 429 (4), this court said: "In ordinary cases, notwithstanding a misdirection, if the court see that justice has been done, and that a new trial ought to produce the same result, the verdict will not be disturbed." In *Myrick* v. *Hicks,* 15 *Ga.* 155, this court said: "A new trial will not be granted, if the verdict of the jury was right, although the charge of the court may have been wrong." In *Hagar* v. *State,* 71 *Ga.* 164, it was ruled: "The verdict was required by the evidence, and in such cases, even if there be error in the charge, it will not necessitate a new trial." In *Griffin* v. *State,* 86 *Ga.* 257 (4) (12 S. E. 409), it was held that an erroneous charge did not require the grant of a new trial, where the verdict was demanded by the evidence. In *Toler* v. *State,* 107 *Ga.* 682 (33 S. E. 629), the court made this ruling: "While the failure of the court, upon a criminal trial in which the evidence against the accused is entirely circumstantial, to instruct the jury concerning the rule applicable to evidence of this character would, in a close or doubtful case, be cause for a new trial, such failure will not require another trial when the guilt of the accused is clearly and convincingly proved, and the charge as to the amount and character of proof requisite to a lawful conviction is such as to leave no room for doubt that the verdict would have been the same even if the court had in terms stated to the jury that, in order to warrant a verdict of guilty, the evidence must not only be consistent with the guilt of the accused, but inconsistent with every other reasonable hypothesis." See *Leonard* v. *State,* 110 *Ga.* 291 (34 S. E. 1015); *Gore* v. *State,* 162 *Ga.* 267 (3) (134 S. E. 49).

7. In ground 72 of his motion for new trial the defendant excepts to the ruling permitting R. E. Lewis, a witness sworn in behalf of the State, to testify, over his objections, as follows: "As to the value of those assets, so far as I know there is no change. At the time the appraisal was made the total was $103,000; and we appraised as good $28,000, we appraised as doubtful $19,000, and we appraised as worthless $55,500." The witness referred to $103,000 of notes negotiated with the Farmers & Traders Bank by the Bankers Trust Company, and found among the assets of the former bank at the time it suspended business. The reference to an appraisal was to one which B. T. Morris, W. C. Smith, W. A. Arnold, and the witness made of said notes. Morris and Smith

were not sworn as witnesses. The defendant objected to the admission of said evidence, upon the grounds, (a) that it was not competent for this witness to testify as to what other appraisers had done; (b) that the matter referred to was res inter alios acta; (c) that it was hearsay. The court overruled the objections and admitted the testimony, and the defendant assigns error. We can not agree with learned counsel for the defendant that this evidence is the rankest hearsay. The issue involved was the solvency or insolvency of these notes. The solvency or insolvency of a party can be established by the opinion of a witness, provided the witness gives the facts upon which his opinion is founded. Such testimony being competent, the jury must decide as to its just weight and effect, and to what extent they will give credit to it. *Crawford* v. *Andrews*, 6 *Ga.* 244; *Riggins* v. *Brown,* 12 *Ga.* 271, 273; *Moore* v. *Dozier,* 128 *Ga.* 90 (4) (57 S. E. 110); *Kirkman* v. *Ashford,* 145 *Ga.* 452 (5), 457 (89 S. E. 411); *Cabaniss* v. *State,* 8 *Ga. App.* 129 (17) (68 S. E. 849). It clearly would have been incompetent for this witness to have testified that others had appraised $28,000 of these notes as good, $19,000 as doubtful, and $55,500 as worthless. This would have been hearsay. But we can not see how it was hearsay for him to testify that a committee of which he was a member had appraised these notes after the bank had suspended business and the superintendent of banks had taken possession of it for liquidation. This was in no sense hearsay testimony, if the witness of his own knowledge knew that this appraisement was made and how the notes were appraised. He gave the method by which this committee made this appraisement and the facts upon which the appraisal was based. He gave this procedure as showing his means of knowledge of the character of the paper appraised; and we see no good reason why this appraisal could not be shown as one of the facts upon which he based his opinion, when sworn as a witness for the State, that the bank was insolvent. He gave other reasons to support his opinion that the bank was insolvent. These facts may not have been conclusive or strongly persuasive of the correctness of the opinion; but, as we have seen, the weight to be given to his opinion was a matter to be passed upon by the jury. We can see no good reason why this witness could not state that this appraisal had been made, not to show the solvency or insolvency of the notes appraised, but as one of the facts upon which he based his opinion touching

their solvency or insolvency. Where a witness knows a fact both from his personal knowledge and from hearsay, and the issue is one upon which the witness can express an opinion after giving the facts, it is competent for such witness to testify that he knows the fact upon which he bases his opinion, both from personal knowledge and from hearsay. *Atlanta &c. Railway* v. *McManus*, 1 *Ga. App.* 302 (2) (58 S. E. 258); *Bitting* v. *State*, 165 *Ga.* 55 (4) (139 S. E. 877). But if the admission of this evidence was erroneous, we would not grant a new trial in this case, for the reason that the other evidence introduced by the State establishes the insolvency of this bank at the time of its suspension, the practical correctness of this appraisal with which we have been dealing, and the dominating management of the affairs of the bank by the defendant; and it wholly fails to rebut the presumption of fraudulent insolvency which the law raises against the defendant.

. 8. In ground 77 the defendant assigns error upon the ruling permitting one Cagle, who was sworn as a witness in behalf of the State, to testify, over his objection, as follows: "I took down the assets that they appraised as worthless [referring to the appraisement of the assets of the Farmers & Traders Bank, said to have been made by Lewis, Morris, Smith, and Arnold]. According to that appraisal that amounted to $114,420.48. They appraised as doubtful assets of $168,159.04." The defendant objected to the admission of this evidence, upon the grounds, (a) that it was the hearsay report of what the appraisers did, and (b) that the defendant could not be bound by what some appraisers determined in this way. The ruling the court made in this matter was as follows: "I think he can state the sum total of the appraisement, if he was present; but as to what appraisements they put on it, I do not think he could testify to that. I think you can ask if he put the figures down, the sum total. Go ahead and just state the sum total, if you made the figures and put that down." Cagle was an expert accountant employed by the State banking department to investigate the affairs of this bank and make a report thereon to the department. The superintendent of banks is required, when he takes possession of a bank for liquidation, to make an inventory of the assets thereof, in triplicate. Acts 1919, pp. 135, 157; 8 Park's Code Supp. 1922, § 2268(l). Such an inventory consists in a list of the assets of the bank, with their estimated value. It is infer-

able from the evidence that the appraisal to which reference is made in this ground was made by a committee appointed by the State bank examiner, with the assistance of this auditor, for the purpose of supplying the inventory required by this provision of the banking act. However this may be, we do not think that this evidence was inadmissible for the reasons alleged. This witness took part in the making of this appraisal. He made the list of the notes appraised, and put down the value of each note as fixed by the appraisers. The purpose of his testimony was not to show the insolvency of these notes. He was sworn to inform the jury what the books and records of this bank and such appraisement showed its financial condition to be, assuming such appraisal to be correct, and what other voluminous records and facts showed the financial condition of the bank to be. In other words, his testimony was offered to show from this appraisal, assuming it to be correct, when taken with other voluminous facts and records appearing in the evidence, whether this bank was insolvent. The hearsay rule does not preclude a witness from stating what certain unsworn statements show, and, assuming them to be true, what they prove. The rule seems to be that where the documentary evidence consists of books of account or documents containing multifarious details, expert accountants may summarize their contents and testify as to the result of the examination, provided the books and documents are made accessible to the court and parties. *Sasser* v. *Sasser, 73 Ga.* 275 (5) ; *Henderson* v. *Central Railroad, 73 Ga.* 718 (2) ; *Central Railroad* v. *Wolff,* 74 *Ga.* 664 (2) ; *Merchants National Bank* v. *Vandiver,* 104 *Ga.* 165 (30 S. E. 650) ; *Cabaniss* v. *State, 8 Ga. App.* 129 (14) (supra) ; 22 C. J. 218, § 182, 14. When the purpose for which this evidence was offered is taken into consideration, its admission was not erroneous.

9. In ground 78 the defendant excepts to the ruling permitting one McGee, a witness sworn in behalf of the State, to testify, over his objections, as follows: "According to this record [referring to the report of the appraisers, Lewis, Morris, Smith, and Arnold, of the assets of the Farmers & Traders Bank], $114,420.80 of these notes appeared as worthless. There is a column marked doubtful, which the record shows amounts to $168,159.04." The defendant objected to the admission of this evidence, upon the grounds that it was the hearsay report of what the appraisers did, and that he

could not be bound by what some appraisers determined in this way. This isolated piece of evidence would be subject to the objection urged against its admission; but when considered in view of the purpose for which it was offered and in connection with the other evidence of this witness, its admission was not improper and erroneous. This witness was the assistant liquidating agent of the affairs of this bank, and was charged with the collection of its bills receivable. The purpose of his testimony was to show the amount of collections made by him on the several classes of notes embraced in this appraisal, and to throw light upon the question of their solvency or insolvency. The purpose was not to prove that this appraisal had been made; but, assuming it to be made, the object was to show how much of the notes classified therein as good, as doubtful, and as worthless, had been collected. The ultimate object was to show whether the notes appraised as good were good, whether those appraised as doubtful were doubtful, and whether those appraised as worthless were worthless. The purpose was not to show the appraisal, but to determine whether the notes appraised were insolvent. We see no valid reason why this appraisal could not be submitted to the witness, and why he could not be questioned as to the success which he had had in collecting the several classes of notes embraced therein, with the view of throwing light upon the question whether they were solvent or insolvent. For instance, this witness testified that he had been engaged in the collection of these notes three months, and stated the means and methods which he had used in endeavoring to collect the same. He testified that he had not been able to collect anything from the notes classified as worthless, except about $900 from the collateral attached to the note of the Traders Trust Co. for $3000. He further testified that he had collected from the notes marked doubtful only $500. He then testified, from his experience and information obtained and his efforts to collect these bills receivable, that the notes classified in the appraisal as worthless were as worthless as they could be. In view of the purpose for which this evidence was offered, we do not think that the objection urged was meritorious. Its introduction was an application of the homely maxim that proof of the pudding is chewing the bag. Where the contents of this writing were material to the inquiry, but the correctness of the classification embraced therein was relevant, it was permissible for the witness to refer to such

document and to describe it in a general way. *Cabaniss* v. *State,* supra.

10. In ground 73 the defendant excepts to the ruling permitting one Bentley, a witness in behalf of the State, to testify, over his objection, as follows: "From my investigation of that kind of collateral and knowing the character and nature of the business carried on by those banks, from a banker's standpoint it was not bankable paper. I would not consider it collateral at all, because it did not appear to have any market value whatever except the market that could be made from the security by the manipulations of the parent bank." The defendant objected to this testimony upon the grounds that it was a pure conclusion of the witness, with no foundation to justify it, and that the argument of the witness was a grossly improper statement. The court overruled the objection and admitted the testimony with the following statement to the jury: "Gentlemen, it is admitted purely as an opinion. I will charge you fully on these subjects later on, to the effect that you are not to be bound by any opinion expressed by any witness. You will consider all the facts and consider the charge that I will give you in that connection. It is admitted purely as an opinion." Whether these notes were bankable papers or not was necessarily a matter of opinion. The witness qualified as an expert. Besides, he gave the facts upon which he based this opinion. So we can not say that the objection that this testimony was a mere conclusion of the witness, without any foundation, was well taken. We can not say that the testimony was a mere argument, or so argumentative as to deprive it of its character as testimony. In their brief counsel for the defendant assert that this testimony was inadmissible for the reason that it invaded the province of the jury, and undertook to pass upon the very question which the jury was called upon to decide. This objection does not appear to have been urged at the trial, and for this reason we can not deal with it.

11. C. N. Davie was sworn as a witness for the State. He testified that the Farmers & Traders Bank, just before it suspended business, had applied to the clearing-house banks of Atlanta for a loan of $100,000, and that the loan had been refused. He was then asked, on cross-examination, if he did not know that there was a difference of opinion among the clearing-house banks as to the question of making this loan. The solicitor-general objected to this

question, and the court sustained the objection and refused to permit the witness to answer. To this ruling the defendant excepts in ground 74 of his motion for new trial. The exception is without merit. It not appearing upon what ground any difference of opinion among the members of the clearing-house association was based, refusal of the court to permit the witness to answer this question does not show any error requiring the grant of a new trial. The burden was upon the movant to show harmful error. Such difference of opinion may have existed for various reasons, none of which would throw any light upon the issues involved in this case. Unless it was shown that it was based upon fact or facts relevant to the issues involved, its rejection would not be error.

12. In ground 75 the defendant excepts to the ruling refusing to permit one Cagle, an assistant superintendent of banks of this State, to answer the following question on cross-examination: "How long has it been the established practice of chain banks in Georgia to exchange call money with each other and to help each other out when they need assistance?" The court did not err in this ruling. To make a custom or usage good, it must not be contrary to law. Custom can not change the positive law of the State. *Berry* v. *Cooper,* 28 *Ga.* 543; *Happ Co.* v. *Hunter Mfg. Co.,* 145 *Ga.* 836 (90 S. E. 61). If these call loans were legal under the banking act, then the making of them did not constitute fraudulent mismanagement of the affairs of the bank. If these call loans or some of them were illegal in that they violated statutes of this State governing the management of banks, then any custom under which such loans were made would not render such transactions valid, and would not rebut the presumption of fraudulent insolvency arising therefrom against the president of the bank, who was responsible for the making of such illegal loans.

13. In ground 79 the defendant asserts that the court erred in charging the jury as follows: "Insolvency of a bank alone would not authorize the conviction of the president or directors who were in charge of such bank during the period when it became insolvent, if it did, and when in the process of becoming insolvent, if it became insolvent; but if the State has carried the burden put upon the State and sustained by proof, beyond a reasonable doubt, the truth of the allegations of the indictment and that the bank was at the time alleged and the date alleged insolvent, the law then places the bur-

den on such president or directors having in charge the management of the bank during such period when the bank became insolvent, if it did so as alleged, of repelling the presumption of fraud thus arising, by showing to the reasonable satisfaction of the jury that the affairs of the bank have been legally administered without intentional fraud, or generally with the same care and diligence that agents receiving a commission for their services are required and bound by law to observe; and if such showing is made, of which the jurors will be the sole judges, such defendant would be entitled to an acquittal." Error is assigned on the ground that the court in effect instructed the jury that the presumption raised by the statute placed the burden on the defendant of rebutting the same by showing that the affairs of the bank had been legally administered and without intentional fraud, or generally with the same care that agents receiving a commission for their services are required by law to observe. Movant contends that the court thereby excluded from the jury, as a means of rebutting such presumption, any other facts or circumstances which might be sufficient to rebut the presumption; and that the court should not have thus limited the jury in considering what, in their opinion, rebutted such presumption, but should have allowed the jury to consider any other legitimate evidence fairly tending to rebut the same. The defendant further insists that this instruction violates the due-process clauses of the State and Federal constitutions. The court did not by this instruction exclude from the consideration of the jury any other facts or circumstances which might rebut the presumption raised by section 28 of article 20 of the banking act, and did not confine the jury to the method of rebuttal specified in said section. On the contrary, as we shall later see, the court did not so limit the jury. This instruction does not violate the due-process clauses of the State and Federal constitutions; and this is so for the reasons given in the division of this opinion dealing with the overruling of the defendant's demurrer to the indictment.

14. In ground 81 the defendant excepts, for reasons the same as last stated, to the following charge of the court to the jury: "But if the State has carried the burden put upon the State and sustained by proof, beyond a reasonable doubt, the truth of the allegations of the indictment and that the bank was at the time and on the date alleged in the indictment insolvent, or within a period

of four years next preceding the finding and return of the indictment into court, the law would then place the burden on such president or directors having in charge the management of the bank during such period, that is, within a period of four years next preceding the date of the finding and return of the indictment into court, when it is alleged that the bank became insolvent, if it did, as alleged, of repelling the presumption of fraud thus arising by showing to the reasonable satisfaction of the jury that the affairs of the bank had been legally administered without intentional fraud, or generally with the same care and diligence that agents receiving a commission for their services are required and bound by law to observe, that is, within a period of four years next preceding the finding and return of the indictment into court; and if such showing is made, of which the jurors will be the sole judges, such defendant would be entitled to an acquittal." For the reasons given in the preceding division, the exceptions are without merit.

15. In ground 82 the defendant alleges that the judge nowhere in his charge instructed the jury that the presumption of guilt arising from the insolvency of the bank might be rebutted by any legitimate evidence fairly and reasonably tending to rebut the same. The movant does not allege that this was error; and we could refuse to deal with this ground for the reason that no sufficient assignment of error is set out therein. But we shall deal with it as if the assignment of error were sufficient. The court did in effect give such instruction to the jury, as follows: "Insolvency of a bank, if brought about by shrinkage, reduction in values, by misfortune or erroneous calculations or bad business judgment, or unintentional bad investment or loans, or a sudden run or unexpected crises, or the like, though done or participated in by the defendant, would not authorize a conviction." Here the court gave to the jury in effect the instruction which movant in this ground says should have been given. The court thus did not confine and limit the jury to the method of rebutting the fraudulent insolvency of this bank which is provided by section 28 of article 20 of the banking act. So there is no merit in this ground.

16. In ground 80 the defendant says that the court erred in charging the jury as follows: "Within the meaning of the law, gentlemen, a bank would not be insolvent if its entire property and assets, exclusive of its capital stock due to its stockholders, and

also the surplus and undivided profits, if any, are sufficient to discharge its liabilities by a process of liquidation, though it may not be able to pay its debts immediately or to pay or discharge all its obligations on demand; the liquidation mentioned, however, meaning a reasonably prompt liquidation duly carried on, within a reasonable time, considering the nature of the assets and liabilities, and not after indefinite holding with the hope of appreciation or increase in the values; of all of which the jurors would be the sole judges." The errors assigned are that the court instructed the jury: (a) to exclude the surplus and undivided profits of the bank from its liabilities and assets in determining whether they were sufficient to meet its liabilities; (b) to exclude the capital stock of the bank and its surplus and undivided profits from its property and assets in determining its solvency; and (c) to reduce the gross amount of its property and assets by the amount of its capital stock, surplus, and undivided profits, and thus determine whether its remaining property and assets were sufficient to meet its liabilities. Properly construed, this charge did not instruct the jury to disregard the surplus and undivided profits of this bank in determining whether its assets were sufficient to meet its liabilities. It did direct the jury to exclude the capital stock due to stockholders in passing upon this question, and instructed them that a bank would not be insolvent if its entire property and assets (exclusive of its capital stock due to its stockholders), and also the surplus and undivided profits, if any, are sufficient to discharge its liabilities by a process of liquidation, though it might not be able to pay its debts immediately, or to pay or discharge all of its obligations on demand. The court in effect and properly instructed the jury to exclude as an asset anything due to stockholders on account of their ownership of capital stock in the bank. The capital stock of a bank is not a liability that should be taken into account in determining the question of solvency or insolvency of a bank, under section 28 of article 20 of the banking act. *Fordham* v. *State,* 148 *Ga.* 758 (6) (supra). In this charge the court in effect instructed the jury that the capital stock due stockholders, that is any liability to them on account of their stock in the bank, should not be considered as an asset. The judge did not in effect tell the jury that capital derived from stock subscriptions, or money due thereon, is not an asset of the bank. On the contrary he instructed that they should consider the entire

property, surplus, and undivided profits as assets in determining whether the bank was solvent or insolvent; but should exclude capital stock due to stockholders. In other words, the court instructed the jury that the interests of stockholders in a bank should not be treated as assets in determining this question.

17. The court was requested to give in charge to the jury the following instructions: (a) "To authorize a conviction of the defendant, you must believe beyond a reasonable doubt not only that the Farmers & Traders Bank became insolvent during the four years immediately preceding the date of the indictment, but that such insolvency was caused or materially contributed to by some fraudulent act of the defendant himself." (b) "Even though you should believe that the Farmers & Traders Bank was insolvent at any time within four years prior to the date of the indictment, but that such insolvency existed also more than four years prior to the date of the indictment, you should find the defendant not guilty." (c) "If you should find that the Farmers & Traders Bank was insolvent within four years prior to the date of the indictment, but that such insolvency was caused by causes which existed more than four years prior to the date of the indictment, you should acquit the defendant." (d) "If under the evidence in this case you should find that the Farmers & Traders Bank became fraudulently insolvent more than four years prior to this indictment, that is, prior to the 31st day of August, 1922, I charge and direct that you find and return a verdict of not guilty." (e) "The burden of proof is upon the State to show that fraudulent insolvency of the Farmers & Traders Bank, as alleged in this indictment, occurred within four years from the date of the finding of this indictment, that is, between the 31st day of August, 1922, and the 31st day of August, 1926. I further charge you that if under the evidence in this case you should believe that the Farmers & Traders Bank was fraudulently insolvent during the said four years., but you further believe that such fraudulent insolvency occurred prior thereto and merely continued during such period, I charge and direct that you find and return a verdict of not guilty." (f) "If you believe from the evidence that the offense alleged in this indictment against W. D. Manley occurred more than four years prior to the finding of this indictment, then the defendant should be acquitted and you should return a verdict of not guilty." To the refusal to give these instructions

the defendant excepts in grounds 83 to 89, inclusive, of his motion. In the charge as given the court instructed the jury that the defendant entered upon the trial of this case with the legal presumption of innocence in his favor, that this presumption continued with him until it was overcome by evidence of such weight and character as to convince the minds of the jurors of his guilt as charged in the indictment beyond a reasonable doubt, and that unless the evidence should convince them to that extent a verdict of guilty would not be authorized. The court further gave the following instructions: (a) "To authorize the conviction of the defendant, the jurors should believe beyond a reasonable doubt that such alleged insolvency of the bank was fraudulent or was brought about and caused by the criminal intention and fraudulent practices of the defendant, either alone or in connection with and knowingly and intentionally aiding and assisting and abetting others named in the indictment." (b) "If the president of a bank that has become insolvent at the time he was indicted or during his administration should show, or if the evidence should show to the reasonable satisfaction of the jury, that his administration of the affairs of such bank has been without intentional fraud, and that there was no criminal intention or fraud on his part contributing to and aiding in the bringing about of the alleged insolvency of the bank, if it was insolvent, he should be acquitted, although the bank may have become insolvent as alleged." (c) "To authorize the conviction of the defendant, the jurors should believe beyond a reasonable doubt that such insolvency of the bank was fraudulent or was brought about and caused by the criminal intention and fraudulent practice of the defendant, either alone or in connection with and knowingly and intentionally aiding and assisting and abetting others named in the indictment, and that such fraudulent practice, if committed, was committed by the defendant within a period of four years next before the finding and return of the indictment into court." It will thus appear that the instructions requested were fully covered by the charge; and for this reason their refusal does not require the grant of a new trial.

18. The court refused a request to instruct the jury to return a verdict finding the defendant not guilty, for the reason that under the undisputed evidence the insolvency of the bank, whether fraudulent or not, if its insolvency was shown, occurred more than four

years before the finding of the indictment. To this refusal the defendant excepts in the 90th and 91st grounds of his motion for new trial. The refusal to direct a verdict is never ground for reversal. *Central of Georgia Railway Co.* v. *Mote,* 131 *Ga.* 166 (62 S. E. 164); *Ivester* v. *McNicholas,* 157 *Ga.* 755 (3) (122 S. E. 417).

19. But the point just dealt with is urged by counsel for the defendant under the general grounds that the verdict is contrary to the evidence and to law. It is earnestly urged that the undisputed evidence shows that this bank was insolvent as far back as 1915, that its insolvency continued from that date down to the date of its suspension, and that the defendant could not have brought about or contributed to its insolvency within four years next preceding the return of this indictment. It is true that R. E. Bentley, an expert witness in behalf of the State, testified that he had made an examination and analysis of the books of this bank, and that from such examination and analysis said bank was insolvent as far back as the first of 1915, and that such insolvency had continued from that date down to the time the bank closed its doors and went into the hands of the superintendent of banks for liquidation. This opinion of this witness is competent evidence on the question of the insolvency vel non of this bank. Such an opinion is not conclusive upon the jury. The testimony is intended to aid them in coming to a correct conclusion upon the subject; but the jury is not bound by such opinion and can disregard it. *Choice* v. *State,* 31 *Ga.* 424 (14); *Wilcox* v. *Hall,* 53 *Ga.* 635 (3); *Baker* v. *Richmond City Mill Works,* 105 *Ga.* 225 (31 S. E. 426); *Bonds* v. *Brown,* 133 *Ga.* 451 (2) (66 S. E. 156); *Martin* v. *Martin,* 135 *Ga.* 162 (68 S. E. 1095). The jury may deal with such testimony as they see fit, giving credence to it or not. The consideration such evidence is entitled to is a question solely for the jury. *Merritt* v. *State,* 107 *Ga.* 675 (4) (34 S. E. 361); *Wall* v. *State,* 112 *Ga.* 336 (2) (37 S. E. 371); *Rouse* v. *State,* 135 *Ga.* 227 (69 S. E. 180). There are reasonable deductions from the evidence in the case which could lead the jury to the conclusion that the insolvency of this bank took place within four years next preceding the return of the indictment. We can not say as a matter of law that the evidence demanded a finding that its insolvency was of earlier date. The court left to the jury the question whether it had occurred within four years prior to the finding of the indictment, and in-

structed them that the evidence must show that it did occur within said four years, before they would be authorized to find the defendant guilty.

20.  The defendant requested the court to give to the jury the following instructions:  (a) "Even though you should find that in the management of the Farmers & Traders Bank the defendant, alone or in connection with others, had been guilty of violations of laws or of conduct which you might consider as fraudulent, you would still not be authorized to convict the defendant unless you further believe beyond a reasonable doubt that such fraudulent con-- duct or violations of law, if any existed, produced insolvency in the bank or was a material contributory cause thereof."  (b) "Despite any presumption arising from proof of insolvency of the Farmers & Traders Bank, in the event you should believe beyond a reasonable doubt such proof has been made, the defendant should be acquitted, unless, upon a consideration of all the evidence in the case, you should believe beyond a reasonable doubt that such insolvency was fraudulent, and that the defendant participated in the fraud producing such insolvency."  The defendant assigns, error upon the refusal to give these instructions, in the 117th and 118th grounds of his motion for new trial.  The requested instructions were fully covered by the court in its charge to the jury, as will appear from the excerpts set out in the 17th division, supra.  For this reason the refusal to give in charge to the jury the instructions as requested does not require the grant of a new trial.

21.  The defendant requested the court to charge the jury as follows:  "The defendant himself need not introduce any evidence in order to repel any presumption arising from proof of the insolvency of the bank, in the event it has been proved, but may repel the presumption, if he can, by the testimony and evidence introduced by the State."  He assigns error upon the refusal of the request, in the 119th ground of his motion for new trial.  The refusal was not erroneous.  The evidence introduced by the State in this case does not rebut or tend to rebut the presumption against the defendant, arising from the proof of insolvency of this bank.  On the contrary such evidence tends to establish the truth of this presumption.  The requested instruction not being warranted by the evidence, the court was justified in not giving it in charge to the jury.  *McCoy* v. *State,* 15 *Ga.* 205 (3) ; *Brock* v. *State,* 22 *Ga.* 98 (2) ; *Nutzel* v. *State,*

60 *Ga.* 264 (3). Besides, the court instructed the jury that the failure of the defendant to make a statement should not be taken against him, that no presumption arose against him because he failed to make a statement, and that his plea of not guilty was a denial of all the allegations of the indictment.

22. In ground 120 the defendant alleges that the court erred in admitting in evidence, over his objection, a document referred to as schedule 7 by the witness Cagle, as purporting to show the assets and liabilities of the Farmers & Traders Bank on July 12, 1926, and what of said assets were appraised as good, what were appraised as doubtful, and what were appraised as worthless, in the appraisal said to have been made by Lewis, Morris, Smith, and Arnold. The grounds of objection were that the schedule was hearsay and res inter alios acta, that he was not bound by the valuation placed on the assets by said appraisers, and that their action as written up in this schedule was not admissible against him. In the 121st ground he insists that the court erred in admitting, over his objection on the same grounds, a document or schedule referred to by the witness Cagle as purporting to show the notes receivable in the Farmers & Traders Bank on July 12, 1926, which were said by R. E. Lewis to have been negotiated to the Farmers & Traders Bank by the Bankers Trust Company, to show which of said notes were appraised as good, which were appraised as doubtful, and which were appraised as worthless, in the appraisal said to have been made by Lewis, Morris, Smith, and Arnold, referred to as schedule 23. These documents were admitted, not for the purpose of showing the truth of the facts therein recited, but solely for the purpose of showing what bills receivable of the bank were claimed by the State to be good, doubtful, and worthless. The State had undertaken by proof to show which of these bills receivable were good, which were doubtful, and which were worthless. These schedules were admissible for the purpose of informing the jury what notes the State claimed to be good, what notes the State claimed to be doubtful, and what notes the State claimed to be worthless; these notes being very voluminous. State *v.* Brady, 100 Iowa, 191 (69 N. W. 290, 62 Am. St. R. 560, 36 L. R. A. 692); Northern Pac. Ry. Co. *v.* Keyes, 91 Fed. 47; 21 C. J. 896, § 1094, 4.

23. We have carefully read and considered the evidence in this case, and find that the verdict is supported thereby. In fact we do

not see how the jury could have reached any other conclusion than that expressed in their verdict.

*Judgment affirmed. All the Justices concur, except Atkinson and Hill, JJ., who dissent.*

ATKINSON, J., dissenting. 1. The indictment was drawn under section 28 of article 20 of the banking act approved August 16, 1919 (Acts 1919, pp. 135-219). That section declares: "Every insolvency of a bank shall be deemed fraudulent, and the president and directors shall be severally punished by imprisonment and labor in the penitentiary for not less than one (1) year nor longer than ten (10) years; provided, that the defendant in a case arising under this section, may repel the presumption of fraud by showing that the affairs of the bank have been fairly and legally administered, and generally with the same care and diligence that agents receiving a commission for their services are required and bound by law to observe; and upon such showing the jury shall acquit the prisoner." The constitutionality of this provision of the act was raised by demurrer to the indictment. One ground of attack expressed in different forms in several of the grounds of demurrer was that the terms of the statute are so general and indefinite as to make the question of criminality dependent upon the idiosyncrasies of the men who may happen to constitute the court and jury, and are such as fail to show persons to be affected what standard of conduct is intended to be required, and for such reasons the statute is void as violative of the due-process clauses of the State and Federal constitutions. This exact question has been before this court only one time, *Snead* v. *State,* 165· *Ga.* 44 (supra), decided by five Justices, holding that the statute was not unconstitutional upon the ground stated. In *Griffin* v. *State,* 142 *Ga.* 636 (supra), Penal Code § 204, being substantially in the same language as section 28 of article 20 of the act of 1919, supra, was attacked as violative of the due-process clauses of the State and Federal constitutions, upon several specified grounds which did not include the ground of attack made in the case now under consideration—the ground of indefiniteness; and this court held that the statute was not violative of the due-process clauses of the State and Federal constitutions "for any of the reasons" assigned. This was not a ruling that the statute was sufficiently definite to satisfy the constitutions. This ruling was followed in *Fordham* v. *State,* 148 *Ga.* 758 (4) (supra),

decided February 13, 1919. The original record of file in this court in that case discloses that the attack made on the constitutionality of the law in that case did not make the question as to indefiniteness of the statute, and consequently no such question was decided. Neither was it decided in *Kunsberg* v. *State,* 147 *Ga.* 591 (supra).

In the recent case of Cline *v.* Frink Dairy Co., 274 U. S. 445, 455-458 (47 Sup. Ct. 681), it was held that the due-process clause of the 14th amendment to the Federal constitution requires a State, in framing criminal statutes, to frame them so "that those to whom they are addressed may know what standard of conduct is intended to be required." Another principle ruled in that case, as embodied in the third division of the opinion, is that if a criminal statute in the first instance sufficiently describes the acts which it intends to punish, and proceeds further to enact provisos which materially affect its purport and effect, the first must be considered in connection with the provisos; and that if the statute as a whole fails to provide a definite standard of guilt, the statute will be insufficient to comply with the requirements as to due process of law as contained in the 14th amendment to the Federal constitution. That case involved a statute of the State of Colorado, which was held to be unconstitutional, and concerning which it was said: "The Colorado Anti-Trust law denounces conspiracies and combinations of persons and corporations, 1st, to create and carry out restrictions in trade or commerce preventing the full and free pursuit of any lawful business in the State; 2d, to increase or reduce the price of merchandise, products, or commodities; 3rd, to prevent competition in the making, transportation, sale, or purchase of commodities or merchandise; 4th, to fix any standard of figures whereby the price shall be controlled or established; 5th, to make or execute any contract or agreement to bind the participants not to sell below a common standard, or to keep the price of the article at a fixed or graded figure, or establish or settle the price between themselves so as to preclude a free and unrestricted competition among themselves, or to pool, combine, or unite any interest they may have in such business of making, selling, or transporting that the price of the article may be affected. The foregoing language sufficiently describes, for purposes of a criminal statute, the acts which it intends to punish; but the Colorado law does not stop with that: it is accompanied by two provisos which materially affect its purport and effect. They

are as follows: 'And all such combinations are hereby declared to be against public policy, unlawful and void; provided that no agreement or association shall be deemed to be unlawful or within the provisions of this act, the object and purposes of which are to conduct operations at a reasonable profit or to market at a reasonable profit those products which can not otherwise be so marketed; provided further, that it shall not be deemed to be unlawful, or within the provisions of this act, for persons, firms, or corporations engaged in the business of selling or manufacturing commodities of a similar or like character to employ, form, organize, or own any interest in any association, firm, or corporation having as its object or purpose the transportation, marketing, or delivering of such commodities; . .' The effect of the first proviso is that combinations, with the purposes defined in the 1st, 2nd, 3rd, 4th and 5th paragraphs of § 1, and declared thereby to be unlawful and void, are not to be regarded as unlawful if their purpose shall be to obtain only a reasonable profit in such products or merchandise as can not yield a reasonable profit except by marketing them under the combinations previously condemned. The second is like the first in declaring that it shall not be unlawful or within the condemnatory provisions of the act for persons engaged in the business of selling or manufacturing commodities of a class that can only be dealt with at a reasonable profit by such previously condemned trust methods, to employ or own interests in an association having as its object the transportation, marketing, or delivering of such commodities at a reasonable profit. . . Such an exception in the statute leaves the whole statute without a fixed standard of guilt in an adjudication affecting the liberty of the one accused. An attempt to enforce the section will be to penalize and punish all combinations in restraint of trade in a commodity when in the judgment of the court and jury they are not necessary to enable those engaged in it to make it reasonably profitable, but not otherwise. . . To compel defendants to guess on the peril of an indictment whether one or more of the restrictions of the statute will destroy all profit or reduce it below what would be reasonable, would tax the human ingenuity in much the same way as that which this court refused to allow as a proper standard of criminality in International Harvester Company *v.* Kentucky, 234 U. S. 216, 232, 233 [supra]."

The cases cited in support of that decision involved statutes of

similar import. They all differ from the section 28 of article 20 of the act of 1919, now under consideration. The first clause of that act declares: "Every insolvency of a bank shall be deemed fraudulent, and the president and directors shall be severally punished by imprisonment and labor in the penitentiary for not less than one (1) year nor longer than ten (10) years." Standing alone this clause is sufficiently definite to meet the requirements of the constitution. It is followed immediately by this language: "Provided, that the defendant in a case arising under this section may repel the presumption of fraud by showing that the affairs of the bank have been fairly and legally administered, and generally with the same care and diligence that agents receiving a commission for their services are required and bound by law to observe; and upon such showing the jury shall acquit the prisoner." This latter clause is not to be construed as qualifying or in any manner changing or modifying the substance of the prescribed penal offense declared in the first clause. It leaves the first clause just as it would have been if the proviso had not been enacted. The words of the proviso go no further than to declare three ways by which a defendant indicted under the first clause "may repel the presumption of fraud," and do not purport to exclude the defendant from urging any other matter that would repel the declared presumption of fraud or disprove any evidence that the State might introduce for the purpose of sustaining the charge of fraudulent insolvency. This view comports with the construction of this clause of the statute as expressed in *Snead* v. *State* and *Griffin* v. *State,* supra. Construing the statute as indicated above, it does not violate the due-process clauses of the State and Federal constitutions on the ground of indefiniteness, as charged in the demurrer to the indictment. This ruling amounts to a concurrence in the judgment relatively to the question dealt with in the 2d division, but not in the reasoning expressed in the majority opinion. The words "affairs" as applied to a bank and "fairly" as applied to administration of the affairs of a bank, as those words are employed in the proviso, are indefinite; but as they are contained only in the proviso which states a rule of evidence, and do not modify or vary the definition of the offense as provided for in the first clause, the fact that they are indefinite does not affect the question.

2. The demurrer to the indictment, in several forms, attacks as

violative of the due-process clauses of the State and Federal consti-
tutions the above-quoted section 28 of article 20 of the act of 1919,
on the ground that the statute makes insolvency of the bank as de-
fined in section 5 of article 1 of the said banking act "presumptive
evidence of fraud," whereas insolvency of the bank as defined in
the statute has no reasonable relation to the fact of fraud sought to
be presumed, and the statute in so declaring is purely arbitrary and
opposed to the due-process clauses of the State and Federal consti-
tutions. Section 5 of article 1 of the banking act declares: "A
bank shall be deemed to be insolvent, first, when it can not meet
its liabilities as they become due in the regular course of business;
second, when the actual cash market value of its assets is insufficient
to pay its liabilities to depositors and other creditors; third, when
its reserve shall fall under the amount herein required, and it shall
fail to make good such reserve within thirty (30) days after being
required to do so by the superintendent of banks." The point is
made that there is no reasonable connection between the failure of
a bank under all circumstances to meet its liabilities when they be-
come due in the regular course, as provided in the first clause of
said section 5 of article 1 of the act of 1919, and the presumption
of fraud which the statute purports to draw therefrom. In this
connection it is urged: "To be prepared to meet all of its obliga-
tions at all times when due, it would be necessary for a bank to
maintain a cash reserve equal to 100% of its deposits subject to
check on demand, whereas the law of Georgia, in the same act, to
wit, section 27 of article 19, provides that a bank need only keep
15% of its demand deposits as a cash reserve, and, if a member of
the Federal Reserve System, may keep even less. The said statute
therefore authorizes a bank to lend out 85% of its demand deposits
on time loans, and yet provides, in the section under which this in-
dictment is found, that the officers and directors are presumed
guilty of fraud in the mismanagement of the bank, if more than 15%
of the depositors demand their money at one time, and if the bank
has not maintained more than the cash reserve required by the said
act." Other reasons are urged as a basis for declaring that there is
no reasonable relation between insolvency of a bank as defined by
the statute, and fraudulent acts of the officers of the bank, on which
to base a presumption of fraud from the mere fact of insolvency
of the bank; but sufficient has been stated to illustrate the point.

This ground of attack is well taken, and renders that part of the act violative of the due-process clauses of the State and Federal constitutions. The statute, in section 28 of article 20, refers to insolvency as referred to in section 5 of article 1. Insolvency as there defined may arise in either one of three specified ways which are designated in the statute. Section 28 does not refer alone to one of the three definitions of insolvency specified in section 5 of article 1, but in terms applies to "every insolvency," meaning "insolvency" as described in any one of the three specified ways.

*Fraud can not be presumed from acts which the law expressly authorizes.* The law expressly authorizes banks to incur debt by receiving money on deposit and lending it out, except the amount required to be kept in reserve as provided in section 27 of article 19 of the said banking act. The money received on deposit may be payable immediately on the check or draft of the depositor. The loans made by the bank to others may be payable at future dates. If a bank thus receiving deposits lends out all its money in regular course of business, except the amount required to be kept as its reserve, it could not pay all its depositors on demand if they should demand payment at the same time. Yet in these circumstances the failure to pay all the depositors would amount to "insolvency" under the first clause of the definition of insolvency as embraced in section 5 of article 1, and raise a presumption of fraud under section 28 of article 20, notwithstanding every loan made by the bank was perfectly good and would be paid in full at maturity. In transactions of the character mentioned the bank would have been acting within its usual banking business and in the exercise of its powers as conferred by law, and there would be no reasonable relation between its acts, or so-called "insolvency," and fraud. The scheme of the act is to draw a presumption of fraud from proof of facts which the statute expressly authorizes. This is wholly unreasonable. Lawfulness of the acts in lending out deposits to the extent authorized is incompatible with "reasonable relation" between inability to pay "on demand" and fraud—the ultimate fact sought to be presumed. The opinion in *Griffin* v. *State*, 142 *Ga.* 636 (4) (supra), quoted approvingly from 37 Central Law Journal, 147, as follows: "The penal statutes are supposed to prevent fraudulent banking. They are not intended to force all banks to keep all deposits in the vault ready for the depositor upon call. Statutes

regulating banking expressly permit the loaning of deposits by requiring the bank to keep on hand a reserve of only 15 to 20 per cent. of their deposits. Does the legislature permit banks to loan 80 to 90 per cent. of deposits, and at the same time fix a heavy penalty for not always having the same money on hand to pay out on demand?" It was said in that case "that, within the meaning of Penal Code (1910) § 204 [substantially the same as section 28 of article 20 of the act of 1919], a bank is not insolvent if its entire property and assets are sufficient to discharge its liabilities by process of liquidation, even though it may not be able to pay its debts immediately as they become due, or to pay its depositors on demand; and that in this statute there is no difference in the meaning of the word 'insolvency' as applied to a chartered bank and the meaning of the word as applied to the financial condition of an individual." Under the definition of "insolvency" as employed in the Penal Code, § 204, it was held in effect that there was reasonable relation between "insolvency" so defined of a bank and fraud, and that the law was not violative of the due-process clause of the constitutions for the several reasons assigned. It would not have been so held if the "insolvency" referred to in the statute did not mean just what it was construed to mean. It was said in the opinion: "With certain limitations, the legislature may enact that when specified facts have been proved, they shall, even in a criminal case, be prima facie evidence of the guilt of the accused, and shift the burden of proof. On this power there are limitations, the principal one of which is that the fact or facts which will raise the presumption and shift the burden of proof must have some fair relation to, or material connection with, the main fact as to which the presumption is raised. The inference or presumption from the facts proved must not be merely arbitrary, or wholly unreasonable, unnatural, or extraordinary, but must bear some reasonable relation to the facts proved."

That decision was followed in *Fordham* v. *State,* supra, where, however, it was stated: "The decision of McFarland *v.* American Sugar Refining Co., 241 U. S. 79 (36 Sup. Ct. 498, 60 L. ed. 899), dealt with a statute which was construed differently from the construction placed upon Penal Code § 204 by this court in *Griffin* v. *State,* supra; and while, on the construction placed upon the different statutes, the results were not the same, there was no con-

flict of principle in the rulings in the two cases." After the decisions in the *Griffin* and *Fordham* cases the banking law (Acts 1919, p. 135) was enacted. Section 5 of article 1, as noted above, made a new definition of insolvency as applied to a bank comprehended by that law, which, as hereinbefore indicated, differed from the definition of insolvency as defined and applied in the *Griffin* and *Fordham* cases. Under this new definition as stated in the first clause of that section, there is no such relation between such insolvency and fraud as would authorize the statute to declare the insolvency presumptively fraudulent. In McFarland *v.* American Sugar Refining Co., 241 U. S. 79 (36 Sup. Ct. 498, 60 L. ed. 899), a statute of the State of Louisiana declared that "any person engaged in the business of refining sugar within this State, who shall systematically pay in Louisiana a less price for sugar than he pays in any other State, shall be prima facie presumed to be a party to a monopoly or combination or conspiracy in restraint of trade and commerce, and upon conviction thereof shall be subject to" a prescribed fine and other penalties. It was held that the statute did not create a valid presumption, and that the statute was void as violative of the equal-protection and due-process clauses of the Federal constitution. It was said in the opinion: "As to the presumptions, of course the legislature may go a good way in raising one or in changing the burden of proof, but there are limits. It is 'essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate.' Mobile, Jackson & Kansas City R. R. *v.* Turnipseed, 219 U. S. 35, 43 [31 Sup. Ct. 136, 55 L. ed. 78, 32 L. R. A. (N. S.) 226, Ann. Cas. 1912A, 463]. The presumption created here has no relation in experience to general facts. It has no foundation except with tacit reference to the plaintiff. But it is not within the province of a legislature to declare an individual guilty or presumptively guilty of a crime. If the statute had said what it was argued that it means, that the plaintiff's business was affected with a public interest by reason of the plaintiff's monopolizing it, and that therefore the plaintiff should be prima facie presumed guilty upon proof that it was carrying on business as it does, we suppose that no one would contend that the plaintiff was given the equal protection of the laws. We agree with the

court below that the act must fall as a whole, as it falls in the sections without which there is no reason to suppose that it would have been passed." Though the statutes are different, the principle there applied also applies to the Georgia statute involved in this case. The result of the change of the definition of insolvency as stated in *Griffin* v. *State,* supra, so as to make "insolvency" include the matter contained in the first clause of section 5 of article 1 of the act of 1919, supra, is to affect section 28 of article 20, which condemns "every insolvency"of a bank, and raises a presumption of fraud on proof of "insolvency" as defined in the act, without more, and to render section 28 violative of the due-process clauses of the State and Federal constitutions.

3. Numerous grounds of the motion for new trial relate to the admission of certain letters from banks in Florida, with reference to alleged claims by the Florida banks against the Farmers and Traders Bank for certain call-money demands. The court erred in the admission of this evidence over the objection that it was hearsay and irrelevant. *Owen* v. *Groves,* 145 *Ga.* 287 (6) (supra) ; *Carrie* v. *Carnes,* 145 *Ga.* 184 (6) (88 S. E. 849) ; *Smith* v. *State,* 147 *Ga.* 689 (95 S. E. 281, 15 A. L. R. 490) ; *Aripeka Saw Mills* v. *Georgia Supply Co.,* 143 *Ga.* 210 (supra) ; *Hickson* v. *Bryan,* 75 *Ga.* 392; *National Council* v. *Van Giesen,* 20 *Ga. App.* 211 (92 S. E. 1022) ; *Johnson County Savings Bank* v. *Richardson,* 9 *Ga. App.* 466 (71 S. E. 779). The error in admitting this evidence was not harmless for the reasons stated in the fifth division of the majority opinion.

4. Grounds 72, 77, and 78 of the motion for new trial, dealt with in divisions 7, 8, and 9 of the majority opinion, complain of the admission of the testimony of certain witnesses as to a former appraisal of certain assets of the bank that was alleged to have been rendered fraudulently insolvent. The appraisal was not made in the presence of the defendant with the opportunity of cross-examination, and the testimony of each witness as to the values declared by all of the appraisers was inadmissible over the objection that it was hearsay.

5. There is no merit in the grounds of the motion for new trial referred to in divisions 10, 11, 12, 15, 16, and 18 of the majority opinion.

6. Three of the requests to charge quoted in division 17 of the

majority opinion, and designated as (d), (e), and (f), stated correct principles of law applicable to the case, and it was erroneous to refuse them. The charge as originally given did not refer at all to the statute of limitations; but after the case had been submitted to the jury and had been considered by them, they called for further instructions from the court upon the subject of what penalty should be imposed. The court, after giving instructions upon that point, stated to the jury: "To authorize the conviction of the defendant, the jurors should believe beyond a reasonable doubt that such insolvency of the bank was fraudulent or was brought about and caused by the criminal intention and fraudulent practice of the defendant, either alone or in connection with and knowingly and intentionally aiding and assisting and abetting others named in the indictment; and that such fraudulent practice, if committed, was committed by the defendant within a period of four years next before the finding and return of the indictment into court." This instruction was insufficient to cure the harmful effect of the error in refusing the requests. The defendant was entitled to have the question of limitation submitted to the jury before they had made up their minds to convict him, and it can not be said that the harmful effect had been removed by giving the instructions after the jury had determined upon a conviction.

7. Complaint is made of refusal of a request to give in charge the following: "I charge you that under the proof in this case and the law applicable thereto the asserted claim of the Bank of Mt. Dora is not a valid liability against the Farmers & Traders Bank, and should not be so considered by you in determining its solvency or insolvency." Numerous grounds complain of the refusal of requests to charge, each identical with that just quoted, except as relating to claims of banks other than the Bank of Mt. Dora. The evidence as to each claim was of the same character, and was to the effect that each of the banks had submitted claims to the superintendent of banks for stated sums of money; but there was no evidence to prove the existence of the indebtedness for which the claims were made. In these circumstances the requested instructions should have been given, because, there being no proof of the existence of the debts upon which the claims were founded, those particular claims ought not to be considered as liabilities of the

Farmers and Traders Bank in passing upon the question of that bank's insolvency.

8. There was evidence of conduct upon the part of the defendant, and of other officers of the bank, which the jury might have found to have been fraudulent acts of the persons committing them, but which nevertheless did not demand a finding that they had reference to or tended to produce fraudulent insolvency of the Farmers and Traders Bank. Evidence of that character having been admitted, and the defendant not being on trial for any separate fraud or for violation of any other statute relating to banks, but being on trial for violation of this particular statute (section 28 of article 20 of the act of 1919), relating to fraudulent insolvency of the bank, it was proper for the court to restrict the issues to a violation of this particular statute, and upon request (as shown by the majority opinion, division 20 (a)) to so instruct the jury that they would not be confused and convict the defendant because he had violated some other statute. The requested instructions quoted in the majority opinion, divisions 20 and 21, stated correct principles of law applicable to the case, and should not have been refused. The evidence brought out by the State's witnesses would have authorized a jury to find that the Farmers & Traders Bank was not fraudulently insolvent. The defendant did not make a statement, but relied upon the evidence adduced from the witnesses introduced by the State. The case of *Green* v. *State,* 124 *Ga.* 343 (52 S. E. 431), cited and applied in *Mann* v. *State,* 124 *Ga.* 760 (53 S. E. 324, 4 L. R. A. (N. S.) 934), sufficiently states the principle that a defendant may rely on the State's evidence to establish, if it does, his defense.

9. It is insisted by the prosecution that if any error was committed in ruling upon the admissibility of evidence or in charging the jury, as complained of in the numerous grounds of the motion for new trial, such error was not cause for a reversal, because the evidence demanded the verdict of guilty that was returned by the jury. A careful reading and consideration of all the evidence and the charge of the court in its entirety does not show that the verdict was demanded by the evidence, or that the general charge sufficiently covered the requests, or cured the defects in the portions of the charge to which exceptions were taken. The face value of the bank's choses in action and other assets exceeded its indebted-

ness. The values of property as based on opinions of witnesses are usually questions for a jury, as also is the question of fraud.

Mr. Justice Hill concurs in this dissent.